IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT JOHN SIMMONS, Individually and as Representative of the ESTATE OF GEORGIA ANN SIMMONS<br><br>JEFFREY ROBERT SIMMONS, and<br><br>SHERRI RENE BOWMAN<br><br>          Plaintiffs,<br><br>vs.<br><br>JOE M. FINCH, PsyD, Former Superintendent, Terrell State Hospital, in his Individual Capacity<br><br>KRANTI PURIMETLA, MD, in her Individual Capacity<br><br>AILEEN FISHER, MD, in her Individual Capacity<br><br>RHONDA MIRANDA, RN, in her Individual Capacity, and<br><br>The TEXAS DEPARTMENT OF STATE HEALTH SERVICES<br><br>          Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:14-cv-00488<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>JURY DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs file this Original Complaint, and would show:

**INTRODUCTION**

1.      Georgia Ann ("Ann") Simmons voluntarily sought care for her bipolar disorder and mania at the East Texas Medical Center.  East Texas Medical Center, however, obtained a court

order on February 15th, 2012, involuntarily committing Ann to Terrell State Hospital ("TSH"), a state mental health facility in Terrell, Texas.

2.      For most of the four days Ann was at TSH before her death, she was unnecessarily and unlawfully kept in restraints.  When Ann died on February 18th, she was in a vest and wrist restraints, even though she had been quiet and calm and there was no physician order for her to be restrained.

3.      The unnecessary and unlawful use of restraints caused Ann's death.  According to the Medical Examiner, Ann died as a result of "pulmonary thromboembolism due to deep venous thrombosis *associated with relative immobility from hospitalization* for psychosis."  (Emphasis added.)

4.      The Center for Medicare and Medicaid Services ("CMS"), the federal agency that administers the Medicare program and evaluates and regulates psychiatric hospitals, investigated TSH following Ann's death.  CMS found that TSH had systemically failed to follow its own policies governing the use of restraints and had failed to follow appropriate standards of care for the use of restraints.  CMS concluded that these deficient practices resulted in Ann's death.

5.      At the time of her death, Ann, a retired school teacher, was sixty-two years old, a loving wife to her husband Robert, and a loving mother of two children, Jeffrey Simmons and Sherri Bowman.

6.      This is a civil rights and damage action brought by Robert Simmons, Jeffrey Simmons, and Sherri Bowman, on behalf of themselves and their wife and mother, Ann Simmons, to redress the violation of her constitutional rights to be free from unreasonable bodily restraint and to receive reasonable care and safety.  This action also seeks compensation for the pain and mental anguish Ann suffered before her death, and for the injury to the spousal- and parent-child

relationships, as well as loss of companionship, society, comfort, affection, happiness and love

Ann's husband and children suffered as a result of Ann's wrongful death.

## JURISDICTION AND VENUE

7.     This civil action is authorized by 42 U.S.C. § 1983 to redress the deprivation under

color of law of rights guaranteed by the United States Constitution.  This Court has jurisdiction

over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

This Court has supplemental jurisdiction to consider Plaintiffs' state law claims pursuant to 28

U.S.C. § 1367.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.     Plaintiff Robert John Simmons, Georgia Ann Simmons' husband, sues in his

individual capacity and as the representative of his wife's Estate.  Robert John Simmons resides

in Pittsburg, Texas.

10.    Plaintiff Sherri Rene Bowman is the daughter of Georgia Ann Simmons.  Sherri

Simmons resides in Arlington, Texas.

11.    Plaintiff Jeffrey Simmons is the son of Georgia Ann Simmons.  Jeffrey Simmons

resides in Kingwood, Texas.

12.    At all relevant times, Defendant Joe M. Finch was the Superintendent of Terrell

State Hospital, and was acting under color of law.  As Superintendent, Defendant Finch supervised

all TSH staff and was responsible for ensuring that TSH was in full compliance with federal and

state law, agency and hospital policies, and related standards of care.  Defendant Finch, as

Superintendent, was ultimately responsible for ensuring the health, safety, and welfare of all of

TSH's patients, including Georgia Ann Simmons.   Defendant Finch was also ultimately

responsible for the hiring, retention, discipline, supervision, and training of the individual Defendants named herein.  Defendant Finch is sued in his individual capacity and may be served with process at 273 Orbit Drive, Lavon, Texas 75166.

13.     At all relevant times, Defendant Kranti Purimetla, MD, was an internist at Terrell State Hospital, and was acting under color of law.  At Terrell State Hospital, Dr. Purimetla assessed and treated Ann Simmons, and issued orders concerning her care and treatment.  Defendant Purimetla is sued in her individual capacity and may be served with process at Terrell State Hospital, 1200 East Brin Street, Terrell, Texas 75160.

14.     At all relevant times, Defendant Aileen Fisher, MD, was a psychiatrist at Terrell State Hospital, and was acting under color of law.  At Terrell State Hospital, Dr. Fisher was the physician on duty on the day of Ann Simmons's death, and as such, was responsible for Ann Simmons's care, safety, and treatment.  Defendant Fisher is sued in her individual capacity and may be served with process at Terrell State Hospital, 1200 East Brin Street, Terrell, Texas 75160.

15.     At all relevant times, Defendant Rhonda Miranda was a registered nurse at Terrell State Hospital, and was acting under color of law.  At Terrell State Hospital, Defendant Miranda was responsible for Ann Simmons's medical needs, care, and safety.  Defendant Miranda is sued in her individual capacity and may be served with process at 407 Cates Drive, Kaufman, Texas 75142.

16.     Defendant Texas Department of State Health Services ("DSHS") is the state agency that operates the State's mental health facilities, including Terrell State Hospital.  Defendant DSHS is responsible for ensuring that all of its mental health facilities, including Terrell State Hospital, are in compliance with federal and state law, agency and hospital policies, and related standards

of care.  Defendant DSHS may be served with process by serving its Commissioner, Dr. David L. Lakey, at DSHS, 1100 West 49th Street, Austin, Texas 78756.

## FACTUAL ALLEGATIONS

Day 1: February 15, 2012

17.     In the early evening of February 15th, 2012, Ann arrived at and was placed under the care, custody, control, and protection of Terrell State Hospital.  She had been transferred from the East Texas Medical Center ("ETMC"), where she had voluntarily sought care for her bipolar disorder and mania.  ETMC obtained a court order dated February 15, 2012, for her involuntary transfer and commitment to TSH.

18.     The presenting problems were listed as decompensation and deterioration of self-care.  Ann was sent to the "Med-2" unit for observation where she was to be observed 1:1 at arm's length.

Day 2: February 16, 2012

19.     On February 16, 2012, at or about 2:16 p.m., a physician ordered Ann restrained in a restraint chair and transferred to the medical unit to receive her initial physical examination.

20.     There is no documentation that Ann was removed from the restraint chair upon arrival at the medical unit or after her physical examination, and there is no documentation or nurses' note documenting when Ann was in the restraint chair or whether Ann was monitored while she was in the restraint chair.

21.     At or about 2:30 p.m., following a very brief assessment, Dr. Kranti Purimetla, an internist, ordered Ann placed in restraints.  On information and belief, Dr. Purimetla's order had a start date/time of February 16, 2012, at 2:30 p.m., and a stop date/time of February 17, 2012, at 2:29 p.m.

22.     Dr. Purimetla's restraint order required Ann to be placed in both wrist restraints and a vest restraint.

23.     At the same time, Dr. Purimetla also ordered that Ann have a naso-gastric tube ("NG tube") and a Foley catheter inserted.  Dr. Purimetla listed "psychosis [with] poor intake & dehydration" as the justification for ordering the NG tube.

24.     Although the order for "bilateral wrist and vest restraints" stated that it was to prevent the removal of the NG tube and for safety, the NG tube had not yet been inserted, and Ann had not tried to remove it.  The only other justification mentioned in the order was "psychosis."

25.     The nurses' notes at 5:43 p.m. show that the NG tube and the Foley catheter had been inserted, and that bilateral wrist restraints had been applied.

26.     At or about 6:31 p.m., documentation shows that a nurse called a physician and received a telephone order for Ann to be given a shot of Thorazine, an anti-psychotic medication. The medication was administered at about 6:00 p.m.

27.     The next nurses' note was at or about 12:18 a.m., but there is no documentation that Ann received a nursing assessment related to restraints or a determination as to the continued need for restraints.

28.     TSH's Specialized Observation Checksheets ("Checksheets") list Ann as resting in bed from 3:30 p.m. to 1:00 a.m.

29.     Although the nurses' notes establish that Ann was placed in restraints at or about 5:43 p.m., TSH's Restraint/Seclusion Flowsheets ("Flowsheets") show no restraint documentation from the time the restraint order was written at 2:30 p.m. on February 16th until 8:00 a.m. on February 17th.

<u>Day 3: February 17, 2012</u>

30.     The nurses' notes at or about 5:33 a.m. on February 17th indicate that Ann had not slept and that she remained restless.

31.     The nurses' notes at or about 11:57 a.m. confirm that Ann was still in bi-lateral wrist restraints and a vest restraint.  Again, there is no nursing documentation that Ann received a nursing assessment related to restraints or a determination as to the continued need for restraints.

32.     The nurses' notes at or about 10:21 p.m. show that Ann was alert, awake, and that she responded coherently to questions, and that she was much improved.  The notes report that Ann said she felt "fine," and that she felt better.  She still had her NG tube and catheter.  There is no nursing documentation indicating whether Ann was still in restraints, or received a nursing assessment related to restraints or a determination as to the continued need for restraints.

33.     Review of the Checksheets and the Flowsheets indicate that Ann's location from 1:15 a.m. to 6:15 a.m. was in the lobby and resting in bed at the same time.  From 6:30 a.m. to 8:00 a.m. Ann was in the lobby and still in soft restraints and a "Houdini" restraint.  By 10:00 a.m. she is moved to the hallway and is "quiet and calm."  The documentation indicates that Ann remained in the hallway until about 4:15 p.m., and that she remained quiet and calm.

34.     Dr. Purimetla's physician note from 4:14 p.m. confirms that Ann remained in a geri-chair with wrist restraints.

35.     From 4:30 p.m. to 5:30 p.m. the documentation lists Ann as resting in bed, and for 5:45 p.m. to 10:15 p.m. as in the lobby.

36.     There is no documentation that shows that Ann was toileted, that foods or fluids were offered, bath needs assessed, or comfort measures assessed during this time (from 8:00 a.m. to 4:00 p.m.), or that she was constantly observed by staff of the same gender.  There is also no

documentation of "Specific Criteria for Release" from restraints, and no behavior is documented other than quiet and calm.

37.     On information and belief, Dr. Purimetla's initial order for restraints expired at 2:29 p.m. on February 17th, and a new order was not written to continue restraints after 2:29 p.m. for February 17th.  Nevertheless, the above documentation confirms that almost two hours past the expiration of Dr. Purimetla's initial order Ann remained in restraints, despite being quiet and calm. There is no documentation that Dr. Purimetla issued a new order for restraints on February 17, assessed Ann for the continued need for restraints, or had Ann released from restraints, despite the expiration of the initial order for restraints.

Day 4: February 18, 2012

38.     The nurses' notes for February 18, 2012, for the 18-hour time period between 12:25 a.m. and 6:12 p.m., contain no documentation that Ann was in restraints, that she received a nursing assessment related to restraints, or a determination for the continued need for restraints.

39.     The Checksheets and Flowsheets for February 18, 2012, and covering the time period from 11:30 p.m. (on February 17) to 6:30 a.m. (on February 18) show Ann to be in bed resting or asleep.

40.     For the next 14 hours, from 8:00 a.m. until 10:00 p.m., Ann is documented to be in the lobby in vest and wrist restraints, despite there being no order for restraints.  During this 14-hour time period, Ann was noted to be quiet and calm.

41.     Nurse Miranda signed all of the Flowsheets for February 18.

42.     There is no "Specific Criteria for Release" documented, and there is no documentation of restraint release interventions, no offer of fluid or foods, no offer of a bath or

shower, no toileting provided, no comfort measures provided, and no documentation that Ann had been moved or ambulated during these 14 hours.

43.     The only other restraint order documented in Ann's medical file shows that Dr. Fisher ordered that Ann be placed in restraints at or about 9:56 p.m. on February 18th, almost 32 hours after the initial order for restraints had expired.

44.     On information and belief, at or about 10:00 p.m., staff informed a nurse that Ann "looked funny," that Ann had been kicking her legs for 25 minutes, and then seemed to be having a seizure.  The nurse assessed Ann, and found that Ann's lips were blue and that she had stopped breathing.   The nurse assistant indicated that staff untied Ann's wrist restraints and Houdini restraint and placed Ann on the floor to begin CPR.  CPR was continued until paramedics arrived at or about 10:19 p.m.  Ann was pronounced dead at Renaissance Hospital.

45.     According to Flowsheets for February 18, nurse Miranda was aware that Ann was in restraints on that day from at least 8:00 a.m. until just before 10:00 p.m. (when the restraints were removed to perform CPR).  Nurse Miranda did not remove Ann's restraints on February 18 even though there is no documentation of an order for restraints until 9:56 p.m.

46.     Although Dr. Fisher was the physician on duty the day of Ann's death, there is no documentation that Dr. Fisher assessed Ann or had her released from restraints, despite there being no order for restraint on February 18 until 9:56 p.m., in despite documentation that Ann had been quiet and calm since at least 10:00 a.m. on February 17.

47.     Following the autopsy, the Dallas County Medical Examiner's office concluded that Ann died as a result of "pulmonary thromboembolism due to deep venous thrombosis associated with relative immobility from hospitalization for psychosis."

CMS's Investigation and Report

48.     CMS independently investigated the circumstances surrounding Ann's death in the context of a broader investigation into the use of restraints at TSH.  CMS concluded that deficient practices in the administration of restraint resulted in Ann's death, and caused harm to three other patients of the fourteen surveyed.   CMS further concluded that such deficiencies had the "likelihood to cause harm to all patient[s] receiving care on the medical unit."

49.     In particular, CMS found that TSH violated the condition of participation requiring it to "protect and promote each patient's rights," as required by 42 C.F.R. § 482.13.  TSH failed to protect and promote patient's rights by failing to follow its own policies governing the use of medical restraints, in accordance with § 482.13(e).  Specifically, CMS's investigation and report concluded that TSH failed to:

1)     Ensure physician's orders for restraints were written per facility policy;

2)     Provide documentation of nursing assessment for patients reviewed who had restraints applied;

3)     Provide the least restrictive interventions when restraint was used; and

4)     Provide assessment to determine the patient was released from restraint at the earliest possible time.

50.     CMS's report found that "this deficient practice … resulted in the death of patient [Ann Simmons] and had the likelihood to cause harm to all patient[s] receiving care on the medical unit."

51.     CMS also found that TSH violated the regulation requiring the hospital to have an "organized nursing service that provides 24-hour nursing services."  42 C.F.R. § 482.23.  TSH failed to have adequate nursing services because it failed to meet the standard set out in the

regulations governing registered nurse supervision of nursing care. *See id.* § 482.23(b)(3). According to CMS, TSH failed to follow its own policy for the use of medical restraints as related to nursing services, in accordance with § 482.23(b)(2).  Specifically, the review revealed that the facility failed to:

1)    Provide documentation of nursing assessment for patients reviewed who had restraints applied;

2)    Provide the least restrictive interventions when restraint was used;

3)    Provide assessment to determine the patient was released from restraint at the earliest possible time.

CMS continued that, "this deficient practice … resulted in the death of patient [Ann Simmons] and had the likelihood to cause harm to all patient[s] receiving care on the medical unit."

52.    CMS concluded that TSH's violations of the federal regulations governing patient rights and nursing services placed patients at risk of potential harm, serious injury, and possibly subsequent death.

53.    Defendants Fisher, Primetla, and Miranda failed to exercise professional judgment by: not properly documenting the use of restraints; by using restraints without proper physician orders for each instance of restraint; by using restraints beyond the acceptable legal limits; by using restraints in the absence of emergency behaviors; by using restraints without the proper and required physician and nursing assessments to determine a continuing need of restraints; by using restraints without the proper and required monitoring and supervision; by using restraints without the proper and required medical care and attention; and by using restraints without the consideration of alternative treatment strategies or interventions.

54.     The acts and omissions of Defendants Fisher, Primetla, and Miranda in regard to these failures resulted in Ann's needless death.

55.     Defendant Finch, as then Superintendent of Terrell State Hospital, owed a duty to Ann Simmons, while in TSH's protection, custody, and control, that she receive reasonable care and safety, and that she remain free of unreasonable bodily restraint.  Defendant Finch also had a duty to supervise, train, and exercise control over Terrell State Hospital employees, including Defendants Purimetla, Fisher, and Miranda.  Defendant Finch failed to fulfill these duties, failed to exercise professional judgment, and demonstrated deliberate indifference to Ann's constitutional rights.  Defendant Finch, as the former Superintendent of TSH, was responsible for the pattern and practice of TSH and its employees' noncompliance with federal and state law and hospital and agency policies, and the deprivation of constitutional rights that resulted from such noncompliance.

56.     Defendants Purimetla, Fisher, and Miranda, deprived Ann of her clearly established and well-settled federal constitutional rights to reasonable care and safety and to be free from unreasonable bodily restraint by failing to follow federal and state law, and agency and hospital policies, and by failing to exercise professional judgment.

**LEGAL PROTECTIONS CONCERNING
THE USE OF RESTRAINT**

57.     Patients at mental health facilities have constitutionally protected liberty interests under the Due Process Clause of the Fourteenth Amendment.  These liberty interests include the right to reasonable care and safety, and freedom from unreasonable bodily restraint.

Federal Protections

58.     To receive Medicare funding, psychiatric hospitals must meet the standards of the Center for Medicare and Medicaid Services, the federal agency within the Department of Health

and Human Services that administers the Medicare program.  CMS has the power to evaluate psychiatric hospitals, and those that fail to meet the conditions established by federal regulations risk losing Medicare funding.  *See* 42 U.S.C. §§ 1395x(e)(1)-(8), (f)(1-(4); 42 C.F.R. § 482 *et seq*.

59.     Pursuant to federal regulations, patients have the right to be free from:

Restraint or seclusion of any form, imposed as a means of coercion, discipline, *convenience*, or retaliation by staff.  Restraint or seclusion may only be imposed to ensure the *immediate* physical safety of the patient, a staff member, or others and *must be discontinued at the earliest possible time*.

*Id*. § 482.13(e) (emphasis added).

60.     Federal regulation defines a "restraint," in relevant part, as an "any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a patient to move his or her arms, legs, body, or head freely . . . ."  *Id*. § 482.13(e)(1)(A).

61.     "Restraint … may only be used when less restrictive interventions have been determined to be ineffective to protect the patient, a staff member, or others from harm," and the "type or technique of restraint or seclusion must be the least restrictive intervention that will be effective to protect the patient, a staff member, or others from harm."  *Id*. § 482.13(e)(2) & (3).

62.     "The use of restraint and seclusion must be … in accordance with a written modification to the patient's plan of care … and implemented in accordance with safe and appropriate restraint and seclusion techniques as determined by hospital policy in accordance with State law.  *Id*. § 482.13(e)(4)(i) & (ii).

63.     In addition, the "use of restraint and seclusion must be in accordance with the order of a physician or other licensed independent practitioner who is responsible for the care of the patient … and authorized to order restraint and seclusion by hospital policy and State law."  *Id*. § 482.13(e)(5).

64.     Each order for restraint or seclusion used for the management of violent or self-destructive behavior that jeopardizes the immediate physical safety of the patient, a staff member, or others may only may be renewed in accordance with the following limits for up to a total of 24 hours:  (A) 4 hours for adults 18 years of age or older. . . ."  § 482.13(e)(8)(i).

65.     "After 24 hours, before writing a new order for the use of restraint or seclusion for the management of violent or self-destructive behavior, a physician or other licensed independent practitioner who is responsible for the care of the patient … must see and assess the patient."  *Id.* § 482.13(e)(8)(ii).

66.     However, "restraint or seclusion must be discontinued at the earliest possible time, regardless of the length of time identified in the order."  *Id.* § 482.13(e)(9).

67.     When restraint is used, "there must be documentation in the patient's medical record" of (i) the "1-hour face-to-face medical and behavioral evaluation if restraint or seclusion is used to manage violent or self-destructive behavior; (ii) a description of the patient's behavior and the intervention used; (iii) alternatives or less restrictive alternatives attempted (as applicable); (iv) the patient's condition or symptom(s) that warranted the use of restraint or seclusion; and (v) the patient's response to the intervention(s) used, including a rationale for the continued use of the intervention."  § 482.13(e)(16).

68.     The federal regulations also contain training requirements for hospital staff because "the patient has the right to safe implementation of restraint or seclusion by trained staff."  § 482.13(f).

<u>Texas Protections</u>

69.     Texas restraint rules substantially mirror the federal regulations, with a few more restrictive provisions.

70.     Texas rule § 415.254(a) mandates that no intervention shall be used "for the purpose of convenience of staff members or other individuals," or "as a substitute for effective treatment or habilitation."  Tex. Admin. Code Title 25, Part 1, Chapter 415, Rule § 415.254(a).

71.     The Texas rules prohibit the use of two or more mechanical device restraints used simultaneously in a behavioral emergency without a physician's clinical justification documented in the individual's medical record.  *Id.* § 415.256(d).  Mechanical device restraints are defined to include a restraint chair, a vest, and anklets or wristlets.  *Id.* § 415.256 (e)(1)&(12)&(16)&(17).

72.     For a restraint used as part of a medical, dental, diagnostic, or surgical *procedure*, if restraint is not part of the usual and customary procedure, it shall only be used if it is medically necessary, ordered by a physician, needed to ensure the individual's safety, and used only after less restrictive interventions have been considered and determined to be ineffective or are judged unlikely to protect the individual or others from harm.  *Id.* § 415.285(a).  Prior to using such a restraint during a medical, dental, diagnostic, or surgical procedure, an assessment of the individual must be done to determine what the risks associated with the use of the restraint are outweighed by the risks of not using it.  *Id.* § 415.285(b).  A physician's order for such a restraint must specify a time limit on the use of the restraint, any special considerations concerning the use of the restraint, the specific type of restraint to be used, who is responsible for implementing the restraint, and instructions for monitoring the individual.  *Id.* § 415.285(c).  The plan for monitoring the individual and the rationale for the frequency of monitoring must be documented in the individual's medical record.  *Id.* § 415.285(e)(2).

73.     For the use of restraint initiated in response to a behavioral emergency, the Texas rules require facilities to use such restraints only "as an intervention of last resort after less restrictive measures have been found to be ineffective or are judged unlikely to protect the

individual or others from harm.  *Id.* § 415.261(b).  Texas defines a "behavioral emergency" as "a situation in which preventative, de-escalative, or verbal techniques have been considered and determined to be ineffective and it is immediately necessary to restrain the individual to prevent (A) imminent probable death or substantial bodily harm to the individual because the individual is attempting to commit suicide or serious bodily harm; or (B) imminent physical harm to others because of acts the individual commits."  *Id.* § 415.253(2)(A)&(B).

74.    When restraint is the appropriate intervention in response to a behavioral emergency, it should be used "for the shortest period necessary and should terminate it as soon as the individual demonstrates the release behaviors specified by the physician."  *Id.* § 415.261(a)(4).

75.    A physician must order each use of restraint in response to a behavioral emergency.  *Id.* § 415.261(a)(5).  The physicians' order must, among other things, designate the specific intervention, specify the date, time, and maximum length of time the intervention may be used, and describe the specific release behaviors that the individual must demonstrate before the restraint will be discontinued.  *Id.* § 415.262(b).  For an original order for a behavioral restraint, a physician may order restraint for a period of time not to exceed four hours for a mechanical restraint for individuals age 18 and older.  *Id.* § 415.263(a)(4).  A physician may renew the original order if a clinically competent nurse has evaluated the individual face-to-face and determined the continuing existence of an emergency, and the renewal order would not result in the use of a mechanical restraint beyond eight hours total for individuals age 18 and older.  *Id.* § 415.263(b)(4).  To continue restraint beyond these time limits, the physician must issue a new order to continue restraint.  Prior to issuing a new order, a face-to-face evaluation of the individual must be performed.  *Id.* § 415.263(c).

76.     As soon as possible after restraint has been implemented in response to a behavioral emergency, a staff member must discuss with the individual the specific behaviors that necessitated the intervention, the reasons the behavior continues to necessitate the intervention, and the behaviors that the individual must demonstrate to be released from intervention.  *Id.* § 415.267(a).  A staff member must document in the individual's medical record all attempts to communicate with the individual and the individual's response to these attempts.  *Id.* § 415.267(c).

77.     As for the observation, monitoring, and care of an individual in restraint in response to a behavioral emergency, a staff member must maintain continuous face-to-face observation of an individual in mechanical restraint, and staff must ensure adequate respiration and circulation of the individual in restraint at all times.  *Id.* § 415.268(a)&(b).  Respiratory status, circulation, and skin integrity must be monitored continuously and documented at least every 15 minutes.  *Id.* § 415.268(b)(1).  Further, an assigned staff member must perform range of motion exercises, for each extremity, one extremity at a time, for at least five minutes during every hour that an individual is in mechanical restraint.  *Id.* § 415.268(b)(2).

78.     The Texas rules also require that staff members receive training and achieve competence in recognizing and responding to signs of physical distress in individuals who are being restrained or secluded.  § 415.257 (b)(5).  Clinically competent registered nurses are also required to be able to assist individuals in meeting behavioral criteria for the discontinuation of restraint or seclusion and in recognizing readiness for the discontinuation of restraint or seclusion. *Id.* § 415.257(d)(6)&(7).  Staff authorized to monitor patients in restraints must meet the same criteria.  *Id*. § 415.257(e)(6)&(7).  Staff authorized to receive and give orders for restraint or seclusion or to perform evaluations of individuals under restraint or seclusion must receive training

and demonstrate competence in using behavioral criteria for the discontinuation of restraint or seclusion and assisting individuals in meeting those criteria. *Id*. § 415.257(f)(3).

79.     The Texas rules also set out the documentation and reporting requirements for restraint used in response to a behavioral emergency. The facility must document the assessment, monitoring, and evaluation of an individual in restraint. "Documentation in an individual's medical record must include: (1) the time the intervention began and ended; (2) the name, title, and credentials of any staff members present at the initiation of the intervention; (3) the time and results of any assessments or evaluations; (4) the physician's documentation in specific or behavioral terms of: (A) the necessity of the order, and (B) other generally accepted, less intrusive forms of intervention, if any, that the physician evaluated but rejected, and the reasons those interventions were rejected; (5) the use of specific alternatives and less restrictive interventions, including preventaive or de-escalative interventions, which were attempted before the initiation of restraint or seclusion, and the individual's response to these interventions, and (6) the individual's response to the use of restraint or seclusion." *Id.* § 415.274(a).

80.     The Texas rules further require that staff members must report daily to the CEO or designee each use of an involuntary intervention, and the CEO or designee must take appropriate action to identify and correct unusual or unwarranted utilization patterns. *Id.* § 415.274(b)(1).

Terrell State Hospital Policy Protections

81.     TSH has its own set of policies and procedures related to the use of restraints.

82.     Any use of the behavioral restraint chair for medical restraint use requires the prior approval of the clinical director or his designee.

83.     A physician must examine the patient before ordering a restraint or validating a telephone order for a restraint.

84.     If the physician is present at the time of the medical restraint, the physician assumes oversight of the restraint and must perform a face-to-face evaluation to determine necessity for the medical restraint.  According to TSH policy, the physician's order must include: (1) consideration of relative contraindications; (2) consideration of alternatives to the intervention; (3) specify type of intervention ordered; (4) any special consideration for the use of restraint; (5) specific reason/rationale for the intervention; (6) maximum length of time for the intervention; (7) who is responsible for implementing the restraint; (8) intervals for release for exercise; and (9) Specific assessment monitoring frequency and rationale (at a minimum, a patient is monitored every two hours).

85.     After a complete order is drafted, a clinically competent registered nurse is required to explain to the patient: (1) specific intervention ordered; (2) specific reason/rationale for the intervention; (3) process for monitoring during the intervention; (4) medication education if relevant; and (5) patient's response to the explanation.

86.     In addition, the registered nurse is required to notify the patient's legally authorized representative and/or family of the restraint. Once a patient is placed in restraints, TSH policy dictates documentation of the restraint and its effect on the patient.  This involves:

1) A  Restraint/Seclusion/Medical  Restraint  Checklist  reflecting  the  following  as identified in the physician's order

   a. Reason for and type of medical restraint
   b. Date and time applied
   c. Specific criteria for release

2) Patient Assessment at least every two hours considering:

   a. Patient's mental status (level of consciousness, sensorium)
   b. Signs of injury associated with the application of restraint
   c. Nutrition/hydration
   d. Circulation and range of motion in the extremities
   e. Vital Signs (respiratory and cardiac status)

    f.  Hygiene and elimination
    g.  Physical and psychological status and comfort, and
    h.  Readiness for discontinuation of the restraint

3) Information regarding the intervention will be reviewed by both shifts at shift change. This will be documented by the oncoming shift and includes:

    a.  The time of the intervention
    b.  Current physical, mental and medical status
    c.  Time medications were given and care that was needed
    d.  Off going authorized staff assigned to the patient will introduce authorized oncoming staff being assigned to the patient.

## CAUSES OF ACTION

### First Cause of Action: 42 U.S.C. § 1983
### Fourteenth Amendment to the U.S. Constitution
### Freedom from Unreasonable Bodily Restraint

87.    Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

88.    Defendants Purimetla, Fisher, and Miranda, acting under color of law, deprived Georgia Ann Simmons of her due process right to be free from unreasonable bodily restraint by failing to exercise professional judgment.  Defendants' failure to exercise professional judgment directly and proximately caused her great conscious pain and suffering, injury, and death.

89.    Defendant Finch, acting under color of law, deprived Georgia Ann Simmons of her due process right to be free from unreasonable bodily restraint by failing to exercise professional judgment and by being deliberately indifferent to her health, protection, safety, and welfare. Defendant Finch's failure to exercise professional judgment and his deliberate indifference to Georgia Ann Simmons's health, protection, safety, and welfare directly and proximately caused her great conscious pain and suffering, injury, and death.

## Second Cause of Action: 42 U.S.C. § 1983
## Fourteenth Amendment of the U.S. Constitution
## Right to Reasonable Care and Safety

90.     Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

91.     Defendants Purimetla, Fisher, and Miranda, acting under color of law, deprived Georgia Ann Simmons of her due process right to reasonable care and safety by failing to exercise professional judgment.   Defendants' failure to exercise professional judgment directly and proximately caused her great conscious pain and suffering, injury, and death.

92.     Defendant Finch, acting under color of law, deprived Georgia Ann Simmons of her due process right to reasonable care and safety by failing to exercise professional judgment and by being deliberately indifferent to her health, protection, safety, and welfare.   Defendant Finch's failure to exercise professional judgment and his deliberate indifference to Georgia Ann Simmons's health, protection, safety, and welfare directly and proximately caused her great conscious pain and suffering, injury, and death.

## Third Cause of Action: Texas Tort Claims Act

93.     Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

94.     Plaintiffs assert a claim under the Texas Tort Claims Act against Defendant Department of State Health Services for its negligent, grossly negligent, and reckless acts and omissions, as well as its conscious indifference to Ann Simmons' health, safety, welfare, and rights that proximately caused her death while she was involuntarily committed to TSH.   Defendant DSHS's negligent, grossly negligent, and reckless acts and omissions include, but are not limited

to, the use or misuse of tangible personal property (i.e., mechanical restraints) and the failure to comply with accepted standards of care.

95.     Defendant DSHS may be held to answer for the occurrence made the basis of this suit because Plaintiffs' claims arise from Defendant's use of tangible personal property, so that sovereign immunity is waived under the Texas Tort Claims Act.

**Fourth Cause of Action: Texas Wrongful Death Act**

96.     Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

97.     Pursuant to the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001-71.012, Plaintiffs assert a claim against Defendant Texas Department of State Health Services for Ann Simmons's death.

98.     As a proximate result of Defendant DSHS's negligent, grossly negligent, and reckless acts and omissions, as well as its conscious indifference to Ann Simmons's health, safety, welfare, and rights, Robert John Simmons has suffered, and continues to suffer, injury to the spousal relationship, including loss of companionship and society, services, consortium, affection, comfort, happiness and love.  Mr. Simmons has also suffered mental anguish, grief, and sorrow, is likely to suffer for long into the future.

99.     Ann Simmons's children, Jeffrey Simmons and Sherri Bowman, have suffered, and continue to suffer, injury to the parent-child relationship, including, loss of companionship, society, comfort, emotional support, affection, happiness, and love.  Ann Simmons's children have also suffered mental anguish, grief, and sorrow as a result of their mother's death, and are likely to suffer long into the future.

100.    For these losses, Plaintiffs seek actual damages, pre- and post-judgment interest, and court's costs.

### Fifth Cause of Action: Texas Survival Statute

101.    Plaintiffs hereby incorporate by reference paragraphs 1 through 86 of this Complaint.

102.    Pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021., Plaintiffs, on behalf of Ann's estate, assert a claim against Defendant DSHS for actual damages for the pain and mental anguish Ann suffered prior to her death, as well as for funeral and burial expenses, pre- and post-judgment interest, and court's costs.

### ATTORNEYS' FEES

103.    Plaintiffs are entitled to recover their attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

### JURY DEMANDED

104.    Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

THEREFORE:  Plaintiffs respectfully request this Court to:

A.    Enter judgment against Defendants;

B.    Award actual damages consistent with the allegations of this Complaint as provided by law;

C.    Award pre- and post-judgment interest as provided by law;

D.    Award funeral and burial expenses as provided by law;

E.    Award Plaintiffs their attorney's fees, expenses, and court costs; and

F.    Grant all such other relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

  /s/ Peter Hofer
PETER HOFER
Texas Bar No. 09777275
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758
512.454.4816 Phone
512.454.3999 Fax
phofer@drtx.org

LIANE JANOVSKY
Texas Bar No. 00784330
DISABILITY RIGHTS TEXAS
1420 Mockingbird Ln., Ste. 450
Dallas, Texas 75247
214.630.0916 Phone
214.630.3472 Fax
ljanovsky@drtx.org

ATTORNEYS FOR PLAINTFFS